Good morning, your honors. Michael Powell representing the appellant in this case. And I think what we're discussing here today is whether or not a citizen has a reasonable expectation, even if they're on in their privacy of their home computer, even if they're on a sharing system, that the government will not run a forensic computer search of their hard drive in the course of going to their particular computer under this file sharing thing. This is what distinguishes this case from every other case that's been cited by the government from the — and I don't know how to pronounce this — the Ganoli case or — Yeah. We know which one you mean. I'm not sure. And the other ones that came up on the 28J, the Schultz case out of the Eighth Circuit and the One Hundred and Tenth Circuit. The only case really that discusses what happened in this case is the unpublished one we cited from the Western District of Pennsylvania, the Criss case. And also, I would direct the Court's attention to Professor Kerr's law review article in Search and Seizure in a Digital World at page — I think it's page 531, where he discusses what — how you end up getting a hash mark. And this is exactly what the FBI agent testified to. He went to the file sharing program. He saw something that attracted his attention. He couldn't view the files. But what he did was he ran this forensic program. And I understand it's from what Professor Kerr says. It's called NCASE. This is not readily available to the general public. And Ganoli and those cases are based on that idea. If you're on a file sharing program that's readily available to the public, then you don't have — you may have subjective expectations, but you don't have an objective one. Well, the law enforcement officer is looking, though, at parts of his file that the public can look at. Right, Your Honor. But he's looking at it in a way with technology that the public can't, because this hash mark thing reads — it's a bit stream. It's — it is — What? I didn't hear what you — It reads a bit stream. In fact, it bypasses — it doesn't look at the file. In fact, the officer testified he — you can't see the hash marks. He couldn't see the hash marks. You need a forensic program to do this hash mark analysis. And generally, this is what the FBI or the agencies do after they've seized the file, is that they run this hash mark program to basically figure out if this matches some known — it's — But if they're looking at a file that anybody in the public can look under and look at, why does it matter how they're looking at it? Well, Your Honor, like the Supreme Court said in the title, you can go look at a house, but you can't look at it with technology that would — would actually expose stuff in there that's not — But see, I guess I'm having the same difficulty that I think Judge Canvey is having about the sort of causal relationship, because if they hadn't used this special program to make the hash marks, they still could have looked — They could have, yes. Absolutely everything. And so I don't understand how your client is any worse off for having this sort of shorthand identification system occur than he would have been had they just patiently looked through everything that was available. What's the difference in the ultimate outcome from his point of view? The difference is this, Your Honor. If they don't patiently look at it — I mean, just what we hear is the government's taking a shortcut. They're doing a search, a forensic search that no member of the public can do when they access this computer. So if we say that you don't have — The search, if they — they can look at everything without it being a search, according to our precedent, because there's no expectation of privacy in the shared files, I guess I just don't understand what the — what difference it makes to the ability to see all of these images. Well, Your Honor, if the government can't look at it and see that it's contraband and the officer said — the FBI agent said that when he logs on that, he can't see what's in that file. He has no clue what's in that file because he can't open it on that computer. So instead of just, as you say, downloading patiently — and I don't think they're going to do this because, from what I understand, there's hundreds of millions of files out there. So, in essence, if they're going to do it legitimately, then — and we're saying that they can download every program they want — then they're never going to find this stuff. So they're now doing a forensic search shortcut before they ever look at anything. And I think this is where we are as a matter of policy, because what you're really saying is this, as the Supreme Court said in Kylo, if they have specialized technology that's not available, then you have — I think any citizen has an objectively reasonable expectation that just because you expose something to the world in general, that that doesn't allow the government to use specialized search techniques to indicate what they're looking for and then pull that out specifically as opposed to anything else. And because what you're actually saying now is that — because if you hook up to  So, to me, there's no difference in saying anybody that uses the Internet, if the government has a special program, they can go look at anything on your computer because you've exposed your computer to the general virtual world of computers. But those are shared files, right? They are shared files, but once you — but once you get on the Internet, basically if you go visit a website, there's cookies that are coming back and forth to you to But the government here is using a specific forensic program that they never use until after they've got a warrant and seize the particular hard drive, and then they do the search in that — because they're looking — they have probable cause to look for specific things. This Court's recently — I mean, this is an evolving area. We're kind of on the front of this, and what I think we have to decide is, as citizens in the computer world, do we have an expectation that any time we hook up to the Internet or we have a file-sharing program, are we now allowing the government to come in and run any kind of technology they want on our personal files — and this is a warehouse of information on our files — to then search for general criminal purposes? And I cited — the Supreme Court made this distinction when the government's just out there fishing for general criminal purposes in the — in the — the barricade cases or the stop cases. While they found it's all right to stop for a DUI check because it's a minor intrusion that takes a second, they would not allow the government to set up a roadblock and have a drug dog come through and sniff the cars for drugs because it was a general — it's a general criminal purpose. And I don't see really any different, in that sense, from this. So if a drug dog isn't a search, but we're not — and we expose ourselves on the road as that's ran in all those cases, but the Supreme Court says we cannot just let the government go use technology and stop everybody just for general criminal purposes, this is no different. Well, counsel, your client has entered into this file-sharing procedure so that other people can look at the files. Is there a process where he can limit who can come in and look at his files? Yes, Your Honor. And — And he didn't do that? Well, no, Your Honor. That's — he testified in fact that he did not use the freeware program. He went out and actually bought the file-sharing program because it was his understanding that you could actually then deny access. And that's one of the things that we look at is whether or not you can deny access, as the Court said in Heppenkamp. And I think this case is way closer to Heppenkamp than it is to Kenoe because the forensic search here wasn't ever exposed. But he believed that he did that. And apparently when the default setting on this program, and I can't — you know, I'm not sophisticated. I'm an old guy, and I don't really know a lot of this stuff myself. But as I understand, as the testimony came out, was that the default setting for this is to share files. He, in his terms of agreement, and he testified without contradiction that his terms of agreement that he wasn't going to share files, he would take files into sharing, but he would not share them. But apparently if you reboot your computer, it goes back to the default settings, and that's what happened in this case. So, I mean, really, I don't think there's any quarrel whether or not he had a subjective — he actually believed he was denying people what we're talking about now as a value judgment. Is there an objective? But I guess the point is he could have protected himself, and maybe by his ignorance he didn't. Well, he thought he did. I mean, that's the difference. He thought he did. And I think that's the subjective aspect of it now. I think that's good enough. Well, I mean, as a subjective, but now what we're asking now is are we prepared to say that the government, if you get on any shared thing, and the Court found otherwise in Heavencamp where there was networked in a school, in a particular university thing, the Court found no, even though there's access, you still have an expectation of privacy, and found the search was valid on other grounds, on special needs. We don't have that here. But in this case, and I know I'm over time here, and I apologize, but I think this is where we're at with this case. This is a significant case in the development of cyber law in terms of do we have, as I said, an expectation, is that we log on to the Internet or we log on to a file sharing that the government is not going to be allowed to forensically search our computer without a neutral magistrate. Thank you. We'll hear from Ms. Olson. Good morning. May it please the Court. Elizabeth Olson for the United States. Good morning, counsel. Mr. Borowi downloaded and installed peer-to-peer file sharing software on his computer. What that program did is it created a share folder on his computer, just like it had created a share folder on the computers of everyone else in the world who had downloaded and installed this same file sharing program called LimeWire. Can they open the file? Can they, or do they have to download it to see it? Anyone, what you do in LimeWire is you have access to all of the files and all of the share folders on everybody's hundreds of thousands, however many people around the world have this program. What you do in LimeWire, and the agent testified to this, is you go into LimeWire, you type sort of what you're looking for, a search term. He gave the district court an example. If you were looking for a recipe for apple pie, you type apple pie, right? And it gives you a list of all the files in all the share folders on every computer in the file sharing network that has the word apple pie in it, right? From there, you can download that file, you can pick one, whichever one, world's best recipe for apple pie, right? Or you can take the second step, which is to look at what else the person who has this apple pie recipe, what else do they have available for share? You can go click a button and look at all the files that are available for download from their, on their share folder. And then from there, yes, you can download whatever you want from that share folder. You download it, you can open it up. When you begin to download it, you can do a preview so you can see what's being downloaded or you can download it. But essentially, by entering into this file sharing network, Mr. Berowi gained access to all the files in all the share folders on these other people's computers, and all these other people gained access to the files on his share, in his share folder. Now, the question in this appeal is whether an individual has a reasonable expectation of privacy in the files in that share folder, and this Court has already answered that question. The answer is no. This Court said in Juneau that an individual's reasonable expectation of privacy in their computers, in their computer files, simply does not survive the voluntary decision to download and install on your computer peer-to-peer file sharing software that opens up the files in that share folder to the world. What is your response to the argument that that may be true, but that doesn't mean that someone can use this, that the government can use this added technology to sort of pre-preview in a way that other peer users would not be able to pre-preview? Well, two responses. One is, and Agent Mitchell testified three times, so just to make this clear, he looked only at the files that were in the share folder, right? I mean, he didn't, this wasn't about analyzing Mr. Berowi's entire computer. This was about the files that were available to share. Any individual member of LimeWire could have, you know, had access to those files. Now, rather than, and as you pointed out, so the agent could have simply, and several, he testified that several of the titles were indicative of child pornography. He could have downloaded those based on the titles. He could have downloaded them. He could have just gone through. Yes, it would have been a labor-intensive process to download and look at all of the files that matched that search term that he had searched for. I think there was testimony that the search term was Lolita Girl, which is a term that's associated with child pornography. He could have just downloaded and opened up all of those files to look at them. This technology that he used that searches for the hash values in those files is essentially a time-saving device, right? I mean, it's a way to focus his efforts. Does it yield any information of any kind that would be not obtainable by simply going through the more time-consuming process? Does it refine it in the way that, say, a telescope looking into your house would refine, would make the information more visible or differently visible? No. Anyone who downloaded and opened up those files would be able to see that they were child pornography. What he was able to, and they probably could have, at least with some of the files, you can anticipate that it's probably child pornography based on what the file title is. But as this Court has recognized, you know, you can't just go on that because people can rename, you know, you can have a bag of heroin and put a sign on it that says sugar. And, I mean, you know, you can rename things to hide what they are. But what this program did, what this forensic tool does is it compares the hash value, which is something like a fingerprint. Every image, it's an algorithm, I don't understand it myself, but every image in a file has a certain, there's an algorithm you can run that creates this hash value. And what the agent had was a list of, or what the computer program does is it has this database of hash values that have been previously identified as being child pornography images. And it runs that algorithm through these files that are available to download to find matches. From there, he gets the idea that this is probably a child pornography image and then can focus his efforts that way. Now, the defendant talked about Kylo and mentioned Kylo in his reply brief as well. But I think the key point to remember is that the holding in Kylo is that it's unconstitutional to use technology to gain information that law enforcement would not otherwise be able to gain without physical intrusion into a constitutionally protected space, right? I mean, the officers in Kylo were using this thermal imaging technology to get information about what was going on in Mr. Kylo's home. That's, without that technology, they would have had to physically intrude into a constitutionally protected space. Now, conversely, if they had used that, if they had used that thermal imaging technology not to get information about what was going on in Mr. Kylo's home, but to get information about what was in his garbage can out on the street awaiting pickup, there would be no Fourth Amendment issue there at all because Mr. Kylo has no reasonable expectation of privacy in that. So the police could have lifted up the lid and seen what was inside. They could have, you know, taken it somewhere and dumped it out. Your analogy would be if they were looking for a metal object in the garbage, could they use a magnet to speed up the process of finding the material in the garbage? That's exactly it because the first step is, is this a constitutionally protected space? Is there a reasonable expectation of privacy in what is being looked at, right? Because a search is only if there's a reasonable expectation of privacy and you're intruding into that. This Court has said those files in that share folder that are available to the hundreds of thousands or millions. I mean, there was, we actually don't know. There was no testimony about exactly how many people have this LimeWire program, but it's a very popular thing. I mean, I think young people in particular, they have it everywhere. Now, I'm not, I'm not particularly technologically savvy myself. So I try to think of the non-technical analogy. And I think the analogy is this. If you take a card table and you put it out on your front lawn by the curb and on that card table, you put a box of books with a sign that says, help yourself, right? You have no expectation of privacy. Anyone, a neighbor, a police officer, anyone walking by can look in the box, peruse the titles of the books. If they see something that they think is interesting, they can leaf through it, right? You have no expectation of privacy and it is simply no defense or it is of no moment for Fourth Amendment purposes for you to say, oh, I meant to take that sign down and seal up the box. Or even, I thought I had, I thought I had taken that sign down and sealed up the box. Now, if you sincerely, honestly believed that you had done that, we could say that you have a subjective expectation of privacy in those books. But if in fact you had not, whatever subjective expectation of privacy you have isn't objectively reasonable. Now, here, the Agent Mitchell testified, pages 52, 76, and 77, that he gained access to the share files, to the files that were in the share folder. He had no trouble getting those. Those files would have been available to anyone else in the world with that same LimeWire software installed on their computer. And what this Court said in Juneau is that if an individual downloads and installs that software on their computer and doesn't have the common sense or the technical savvy to hide their illegal pornography from other people on the network, it's simply, it is simply of no constitutional moment. Unless the Court has any other questions. No. Thank you very much. Mr. Powell, you used up your time, but you may have a minute for rebuttal if you would like. Thank you. We made the analogy to Arizona v. Hicks. What you're saying to Arizona v. Hicks. That was our analogy. So if you're saying the file sharing idea, I mean, this is my analogy. And translating virtual to physical kind of bends my brain a little bit. But we use that analogy. The police officers were legitimately in that house at the time, okay? So if you're saying LimeWire lets them legitimately get into the computer, fine. But if they can't see the file, all they can see is the hash mark, that is the identical analogy to what the Supreme Court found was unconstitutional in Hicks. They came in that house legitimately to have another reason. They saw the stereo equipment. They went over there. They moved the stereo equipment and got the identifying material off of the machines. And that would be exactly what they did with the hash marks. And then they went back and got a warrant because it turned out it was stolen. Now, what we're talking really here is a subspecies or an aspect of plain view. Plain view because the files are shared. Plain view because they can look at it. But the reality of it is that they can't see it from their computer. They have to download it. But what they do here is they go look at the serial numbers first. And then they only download the stuff that they think might be illegal or contraband. But if they can't see that it's contraband, even if it's laying out on the street is what the Supreme Court said was stolen, they can't see it. And that's the only one. Sotomayor, the time didn't run, but I think you probably did use up your extra rebuttal time. I'm sure I did, Your Honor. Thank you for your indulgence. We appreciate the arguments in this very interesting case. And it is submitted. We'll take about a 10-minute break.
judges: Fletcher B. , Canby, Graber